Filed 4/27/21

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090172 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE022095) |
| v. | |
| REBECCA THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed as modified.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IC through VI (i.e., IC, II, III, IV, V, and VI) of the Discussion.

Defendant Rebecca Thomas lived with her boyfriend codefendant Taylor Montgomery-Gutzman and her 22-month-old twins K. and B. In the late afternoon and early evening hours of October 13, 2016, while defendant was out trying to buy heroin, K. stopped breathing and ultimately died. An autopsy of K. revealed he was strangled to death. B. also exhibited signs of distress and, upon a physical examination, it was revealed B. suffered from extensive internal injuries. Most of B.'s injuries were recently inflicted but some were several weeks old.

Defendant and Montgomery-Gutzman were tried together for the murder of K. and abuse of B. Defendant claimed Montgomery-Gutzman inflicted all the injuries and she was unaware of his treatment of the twins. Montgomery-Gutzman claimed defendant was responsible. In his effort to show defendant was responsible, Montgomery-Gutzman introduced evidence defendant had a propensity to commit child abuse. Over defendant's objection, the court admitted propensity evidence and instructed the jury it could use the propensity evidence to raise a reasonable doubt as to Montgomery-Gutzman's guilt. In the published portion of this opinion, we conclude the trial court did not err by admitting propensity evidence nor did it confusingly instruct the jury on how it could consider the evidence.

In the unpublished portion of this opinion, we reject defendant's remaining instructional error claims and her ineffective assistance of counsel claim regarding her attorney's performance at sentencing. We agree, however, that defendant's abstract of judgment must be corrected to accurately reflect the trial court waived the court security fee and criminal conviction assessment. Thus, we affirm defendant's convictions for the second degree murder of K., for assault with force likely to cause great bodily injury of K., and for permitting both K. and B. to suffer unjustifiable physical pain and mental suffering, which she willfully caused or permitted as to K. that resulted in his death.

FACTUAL AND PROCEDURAL HISTORY

I

*Facts Underlying The Crimes*

Defendant hated children and never wanted to have them. Despite that fact, defendant had several children and a history of involvement with child protective services. Her first interaction with child protective services occurred in 2004 when defendant's oldest child was three weeks old and defendant told a friend not to comfort the infant when he cried because defendant did not want him to be spoiled. Soon thereafter, defendant called the same friend and told her the baby was not having a good day, and he was crying uncontrollably. Defendant said she had "already tried killing the kid; I strangled him until he stopped breathing." Defendant's friend reported the incident to child protective services. The report was determined to be unfounded and defendant was given information about a crisis nursery and family resource center. Defendant's oldest child went to live with defendant's parents at six months old and continued to do so, except for a year when he was five years old. While the living arrangement was prompted by child protective services, there was no official order requiring defendant's oldest child to live with defendant's parents.

Defendant's second child was born eight years after her first. At that point, defendant had a methamphetamine and heroin addiction, as did the father of defendant's second child. The two were violent with each other, and their child never lived with them. Instead, the child lived with defendant's parents. In the years that followed, their child sometimes stayed with defendant overnight, but defendant's parents raised the child.

Sometime after her second child was born, defendant stopped doing drugs, except for marijuana and prescription methadone. While taking methadone, she became pregnant with twin boys, K. and B. The twins were born eight weeks premature and tested positive for methadone and marijuana at birth but did not suffer from withdrawals.

3

Unrelated to their positive drug tests, both K. and B. had breathing issues due to their premature lungs. Further, their intestines were premature, requiring them to be fed through a gastric tube. K. and B. remained in the hospital for four months because they had trouble eating by mouth and eating and breathing simultaneously. They also suffered from apnea prematurity, which meant they did not always remember to breathe, but outgrew that condition before being discharged.

Although the twins progressed in the hospital, they each required insertion of a gastric tube directly into their stomachs for nutrition. Defendant was often hard to contact during the twins' hospital stay, but she was trained on how to feed the twins via the gastric tube before their release. Upon discharge, defendant was told not to orally feed the twins and to only use the gastric tube. She was given a feeding schedule and a pump to deliver their meals through the gastric tube slowly over time. If their meals were delivered too quickly, the twins were in danger of vomiting, thus failing to receive their required nutrition. During feedings, it was required that someone be attentive to the twins throughout the process. Defendant was offered the assistance of a home nurse because feeding two infants with a gastric tube was difficult. Defendant declined the assistance of a nurse.

Two days after the twins were released, defendant rushed B. back to the hospital because he was having trouble breathing. He was admitted to the hospital for several weeks. During the admission process, defendant was seen feeding K. with a bottle in an elevator. Child protective services intervened and took the twins from defendant's care. The twins were placed back in her care six months later. After the twins returned to defendant's custody, she lived with them and her older children at her parents' home.

When the twins were nearly a year and one-half old, defendant moved from her parents' home and into an apartment complex where Montgomery-Gutzman lived. Montgomery-Gutzman was in his early 20's, nine years younger than defendant, and did not have children of his own. He lived with friends and defendant often saw him playing

4

with children who lived in the apartment complex. He appeared kind and gentle with them, and the children appeared to like him. After a short time of being neighbors, Montgomery-Gutzman moved in with defendant. Their relationship was somewhat romantic. Defendant had sexual intercourse with Montgomery-Gutzman two or three times during their entire relationship and thought of him as more of a roommate.

Indeed, defendant used Montgomery-Gutzman predominantly for childcare. He was "helpful" and "obedient," appeared "calm" and "soft," but "evasive." He did anything defendant needed him to do, including watching the twins when she ran errands. Defendant jokingly described Montgomery-Gutzman as her babysitter to several friends. She further said she was with Montgomery-Gutzman only out of convenience because he watched her children. Defendant said having Montgomery-Gutzman around allowed her to come and go as she pleased. Defendant acted "rude" and "mean" toward her children and was not a comforting mother. Defendant gave the impression that K. and B. were an inconvenience to her.

Montgomery-Gutzman smoked marijuana and purported to suffer from various mental health conditions requiring medication. While he had used heroin before moving in with defendant, Montgomery-Gutzman's use increased and he began taking the drug intravenously with defendant.

Shortly after Montgomery-Gutzman and defendant moved in together, B. was rushed to the hospital again for breathing issues. He stayed in the hospital for a month where he had more breathing issues, so a tracheotomy was inserted to help him breathe. B.'s breathing issues were due to a floppy airway that did not always stay open to provide adequate support for breathing and eating. Montgomery-Gutzman visited B. in the hospital and learned from defendant how to care for and clean B.'s tracheotomy. When B. was released from the hospital, defendant accepted the assistance of a home nurse, who came to the house every weekday for multiple hours to assist with B.'s care.

5

Because of the tracheotomy, B.'s breathing was audible and raspy sounding. It annoyed defendant to hear B. breathing and to clean his tracheotomy.

By the time the twins were 22 months old, defendant, the twins, and Montgomery-Gutzman had moved to a new apartment. While he still required a gastric tube, K. put on quite a bit of weight and was bigger than his brother. He held most, if not all, of his food down and was active and able to walk. B. was not thriving to the same degree as K. B. continued his nutrition via his gastric tube and would often vomit after feedings. Defendant usually fed B. by manually injecting nutrition into his gastric tube over a short amount of time, while the home nurse devoted to B.'s care, fed him through a machine that would deliver nutrition slowly. B. could not walk or talk and always appeared low in energy, although happy. The twins would play and climb on each other.

While living in the new apartment, defendant occasionally used methamphetamine with the apartment manager, sometimes after sneaking out of the apartment in the middle of the night. She lost weight, leading defendant's mother to suspect defendant was using methamphetamine. Defendant also met up with the father of her second child on several occasions to buy and use heroin.

In late September or early October of 2016, defendant noticed an oblong burn mark on K.'s foot. Defendant told her mother she believed it was caused by K. stepping on a lit cigarette Montgomery-Gutzman left on the ground outside the apartment. Defendant's mother told defendant to take K. to the doctor. Also around this time, the apartment manager saw K. and B. all alone walking and crawling, respectively, toward the main street outside the apartment complex. He stopped them and took them back to the apartment, where defendant and Montgomery-Gutzman were sleeping on the couch.

The apartment manager thought Montgomery-Gutzman was a clingy and jealous boyfriend and was rude to the manager and other men with whom defendant associated. Montgomery-Gutzman often borrowed the apartment manager's phone to contact defendant when she failed to answer Montgomery-Gutzman's calls. In early October,

Montgomery-Gutzman approached the manager and told him he felt like "he was going to explode, that he was going to lose it." Montgomery-Gutzman also referenced needing to go to a mental hospital.

On October 12, 2016, defendant took the twins to the park to meet a friend, who also brought her children. The friend noticed a large bruise and scratches on B.'s face. B. was also acting "sad" and appeared to have lower energy than usual. The friend jokingly asked defendant if she was beating her children. Defendant responded that she did not know how the injury to B. occurred because she was not home when it happened. Defendant said she did not know if Montgomery-Gutzman inflicted the injury, but that it was likely K. who inflicted the injury. The friend did not believe K. inflicted the injury because it was too serious of an injury to have been inflicted by a child.

Defendant's mother also saw the injury to B.'s face that day. Defendant told her mother K. probably caused the injury and that it happened while she was at the hairdresser and that Montgomery-Gutzman was watching the twins. When defendant's mother told defendant she should take B. to the doctor, defendant said she did not want to because she did not want child protective services to open a case on her.

On October 13, 2016, defendant left in the morning to go to a methadone clinic. She left the twins with Montgomery-Gutzman. She returned around 1:00 p.m. and then Montgomery-Gutzman left to go to the methadone clinic to get his daily dose. When he returned home, defendant fed the twins and gave each of them melatonin to help them sleep. He and defendant then rested together on the couch. Defendant left around 3:30 p.m. to get heroin.

While defendant was gone, Montgomery-Gutzman went to a neighbor's apartment to borrow a cigarette rolling machine. Montgomery-Gutzman appeared agitated and said he was "very upset" because somebody was trying to take his family. Montgomery-Gutzman further said he wanted to beat up somebody. The neighbor encouraged Montgomery-Gutzman to calm down, and then Montgomery-Gutzman went home.

7

At 5:08 p.m., Montgomery-Gutzman called defendant and told her K. was not breathing and she needed to come home. She told him to stimulate K. to make him responsive and that she was coming home. Montgomery-Gutzman responded, "that would be nice" and abruptly hung up the phone. Thereafter, defendant attempted to call Montgomery-Gutzman multiple times to no avail. She also texted him twice inquiring about K.'s status. Montgomery-Gutzman ultimately called defendant back at 5:18 p.m., right as defendant was driving into the apartment complex. When she got into the apartment, defendant saw Montgomery-Gutzman performing chest compressions on K. K.'s complexion was gray and his lips were blue. Defendant called 911 and took over doing chest compressions and mouth-to-mouth resuscitation. Montgomery-Gutzman went outside to flag down emergency responders.

Eventually, police and fire personnel arrived and were able to regain K.'s pulse before taking him to the hospital. Defendant and Montgomery-Gutzman were initially questioned at the apartment. During defendant's questioning, she tended to B. who was making loud and raspy sounds while breathing. When asked by a police officer if B. was alright, defendant responded that he always sounded like that. Both defendant and Montgomery-Gutzman were transported to the Citrus Heights Police Department for further questioning. While there, officers again raised concern about B.'s breathing and general inactivity. Defendant again assured officers that B. was fine and always sounded that way. Regardless, officers had B. transported to the hospital.

K. died at 5:48 p.m. His death was caused by strangulation and blunt force trauma. The blunt force trauma likely occurred before K. was strangled because the trauma produced bruising, which could have occurred only while K. had a pulse. It was further unlikely K. had a pulse after being strangled. K. had bruising and scraping on the front of his chest and deep bruising throughout his neck region. He also had bruising on both eye lids and the backside of his head. K. further had bruising to the tissue underneath the bones in his chest, which was likely not the result of chest compressions

8

because of the amount of blood present during the autopsy, suggesting K. was breathing at the time the injury was inflicted. Similarly, there were injuries to K.'s liver that could be associated with chest compressions but for the fact that blood was present suggesting the injury was inflicted while K. was breathing. K.'s death was not accidental and "the results of the injuries that he sustained would have resulted in death at or about the time that they were inflicted."

B. had extensive and numerous injuries, both old and new, indicating he was the victim of ongoing child abuse. His old injuries included four rib fractures and a fracture to his right clavicle. These fractures were at various stages of healing. B. also had a healing injury inside of his mouth. Further, X-rays taken of B. when he underwent a tracheotomy showed he had a healing rib fracture at the time.

B.'s new injuries included red lines and swelling across his cheek appearing to indicate a slap mark. B. also had a tear to one of his ears, suggesting his ear was stretched so far that it tore. This was likely the product of a punch, slap, kick, or pull. B. also had three signifiers of abusive head trauma, which was consistent with some sort of whiplash or shaking injury. First, B. had retinal hemorrhages or blood vessels that had burst and bled in his eyes. Second, B. had subdural hemorrhages, or blood on his brain, and intraventricular bleeding, meaning bleeding in the brain. The blood in B.'s brain was such a critical problem that it required placement of a drain for a week to release the blood and relieve pressure in B.'s skull. With such an injury, children typically present with vomiting, irritability, change in cry, fussiness, apparent pain, sleepiness, or refusing to sleep because of pain. Due to this injury, B. suffered from widespread low oxygen throughout his brain that killed brain cells and altered his brain permanently. This injury also caused B. to experience problems with his breathing. Third, B. had vitreous hemorrhages, meaning blood in the middle or "jelly" of the eye. This manifested itself in B. through swelling, broken blood vessels, and a blood blister in his eye. The most common cause of this type of injury is blunt force trauma to the eye.

9

Also new were external and internal injuries to B.'s torso and abdomen. He had several bruises to the front of his chest overlying his sternum and ribs. Internally, B. had fractures along the front ends of his right and left ribs that met his sternum, meaning his sternum had detached from his rib cage. This was an incredibly unusual and significant break that likely resulted from a significant push or blunt force trauma to the sternum and would have been extremely painful. The broken ribs caused a small laceration to B.'s heart. This resulted in his heart not being able to pump properly and a significant amount of blood to accumulate in and around B.'s heart that required draining. The rib fractures also caused two liver lacerations and a laceration to the spleen, resulting in further bleeding into B.'s abdomen and pelvis. Because of the significant bleeding, B. required multiple blood transfusions. The trauma causing the rib fractures also caused bruising to B.'s lungs. A common accidental cause of these injuries would be a car crash, where the victim was not restrained and had been thrown from the car. Another accidental explanation would be that B. had been trampled by a horse.

B. was in the hospital for several months. At first, he was in a sleepy state and then progressed to a very low-energy limp state. He did not react to visual stimulation, leading medical personnel to believe his brain injuries resulted in blindness. At the time of his injuries, B.'s development was equivalent to that of a five-month-old child. With time, B. improved and he learned to walk with the assistance of a walker. He was able to speak and see.

## II

### *Defendant's Statements*

Defendant gave multiple statements to police and testified at trial. In each instance she stressed that she loved and cared for her children and would never hurt them. She believed Montgomery-Gutzman treated her children well. She had never seen him act aggressively toward them or injure them in any way. If she had seen him hurt the twins, she would have never left them alone with him or been in a relationship with him.

Defendant also repeatedly stated that she feared child protective services and worried that any interaction with child protective services would result in her children being taken from her. Much of this fear stemmed from defendant's past interactions and removal of all her children at one point or another. For instance, B. and K. were removed from her care when they were infants and shortly after they were released from the intensive care unit. Their removal was because a nurse saw defendant feed K. with a bottle in an elevator. Defendant believed she was allowed to feed the twins in this way because that was how the twins were fed while in the intensive care unit and a nurse had told her it was acceptable when the twins were discharged. The twins were returned once defendant had completed drug and alcohol classes, which included biweekly drug tests, and training on how to properly feed them.

Although Montgomery-Gutzman had mentioned to her that he suffered from various mental health conditions and took medication, she had never seen him have any breakdowns or episodes that would lead her to believe he posed a risk to the twins. She believed he was exaggerating. Montgomery-Gutzman also began using drugs more heavily once he met defendant and she introduced him to people who could get him drugs.

As for the old injuries to K. and B., defendant claimed none of those injuries happened in her presence and that she always believed they happened through rough play with each other or because the children climbed on furniture in the house. She always encouraged K. and B. to play rough with each other. She did this because she wanted them to grow up strong. During police interviews, defendant claimed that K. would often hold his breath until his lips turned blue and spots appeared on his face. When she asked doctors about this, they told her K.'s behavior was likely a stress response. She claimed she gave K. and B. melatonin on the day of the incident because they had both been sick for several days and had not slept well the night before. While the twins' doctors never

11

recommended she give them melatonin, her friend told her that a doctor recommended its use for her child as a sleep aide.

<h2 style="text-align:center">III</h2>

<em>Montgomery-Gutzman's Statements</em>

Montgomery-Gutzman gave several statements to police and made several unsolicited statements in their presence. While in the apartment after officers first responded to the 911 call, Montgomery-Gutzman expressed fear he would be blamed for K.'s injuries and death because he was the only person around when K. became unresponsive. He expressed these same fears during several police interviews.

During his police interviews, Montgomery-Gutzman claimed that after defendant left to get heroin, he buckled the twins in chairs. He sat in the living area of the apartment and looked in on them occasionally. Later in the afternoon, he let them out of the chairs to walk around. He made coffee and went outside to have a cigarette and did not pay attention to the twins for nearly 15 minutes. When he came inside, K. was on the floor of the twins' bedroom and appeared to be in severe distress. Montgomery-Gutzman put B. in his crib and called defendant to tell her K. was not breathing. Montgomery-Gutzman then began giving K. chest compressions but did not call 911. He did not answer defendant's phone calls and texts because he was busy giving K. chest compressions.

<h2 style="text-align:center">IV</h2>

<em>Trial Proceedings</em>

At trial, the prosecutor's theory of the case was that Montgomery-Gutzman strangled K. to death and that defendant left K. with a person she knew to abuse her children. Because the injuries to B. were of varying ages, the prosecution pursued a theory that either defendant or Montgomery-Gutzman was responsible for the infliction of those injuries.

Montgomery-Gutzman's defense was that defendant inflicted all the injuries on the twins and that he was innocent of the crimes charged. As to K., he argued defendant strangled him before she left to get heroin and the strangulation did not cause K. to be in distress until Montgomery-Gutzman was alone with K. Montgomery-Gutzman elicited from the pathologist the concept of delayed strangulation, meaning that a person could be strangled in a way that did not immediately result in death. Instead, the strangulation would cause an internal injury, such as a damaged artery, or condition, such as a blood clot, that would take time to materialize and cause death. The pathologist believed K. died at the time he was strangled and was not the victim of delayed strangulation. While studies purporting to credit delayed strangulation as a cause of death found an internal injury or condition in the subjects of their studies, the pathologist did not find any internal injury or condition in K. other than the strangulation itself. The jury found Montgomery-Gutzman not guilty of the first degree murder of K., but guilty of second degree murder. It also found Montgomery-Gutzman guilty of assault of K., a child under eight years old, by means of force likely to produce great bodily injury resulting in death, and of permitting B., a minor child, to suffer unjustifiable physical pain and mental suffering.

The jury found defendant not guilty of the first degree murder of K., but guilty of second degree murder. The jury further found defendant not guilty of the assault of K. resulting in death, but guilty of the lesser included offense of assault of K. with force likely to cause great bodily injury. It found, as to both K. and B., defendant guilty of permitting a minor child to suffer unjustifiable physical pain and mental suffering. Specifically as to K., it further found the allegation true that defendant, while having the care and custody of K., and under circumstances likely to cause great bodily harm or death, willfully caused or permitted K. to be injured or harmed and that injury or harm resulted in death.

The trial court sentenced defendant to a total of 21 years to life in prison. This sentence consisted of 15 years to life for K.'s second degree murder and the upper term

of six years for the abuse of B. The court imposed, then stayed pursuant to Penal Code section 654, one year for assault with force likely to cause great bodily injury to K. and two years eight months for permitting K. to suffer unjustifiable physical pain and mental suffering resulting in death. When imposing the upper term of six years on the conviction involving B., the court found as "the aggravating circumstances that [d]efendant as the victims' mother held a position of trust. There were extensive, prolonged injuries over time. This was not an isolated incident." The court waived the various fines and fees, except for the restitution fine.

Defendant appeals.

## DISCUSSION

## I

### *Defendant's Contentions Related To The Propensity Evidence Offered By Montgomery-Gutzman*

Defendant raises multiple issues concerning her statement in 2004 that she strangled her oldest child until he stopped breathing. She argues the trial court erred by admitting this evidence, which was offered by Montgomery-Gutzman, because it did not amount to third-party culpability evidence and was inadmissible under Evidence Code[1] section 1109. She also argues the trial court's instructions regarding how the jury could consider this evidence were confusing in one respect and unsupported by substantial evidence in another. We disagree.

## A

### *Background*

The trial court admitted defendant's 2004 admission to a friend regarding her oldest child, then an infant, that she "already tried killing the kid; I strangled him until he

---

[1] Further section references are to the Evidence Code unless otherwise indicated.

14

stopped breathing." Further, the trial court admitted the testimony of the child protective services officer who investigated the friend's report of defendant's admission. That officer testified she conducted an emergency response, which was aimed at answering the question of whether the infant was safe. She made contact with defendant, who was at home with several people also present, and asked questions about the friend's report. When the officer made contact with defendant's oldest child, the infant was alive and sleeping peacefully in bed. She saw no signs of injury or abuse to the infant. The officer gave defendant information about a crisis nursery and family resource center before concluding the report of physical and emotional abuse was unfounded.

The officer's report, however, indicated defendant "did not say that she choked the baby, had not choked the baby, and had no intention of choking the baby." The officer testified her notation was unclear and poorly written, and that she had no knowledge of the event outside of her report. To the officer, her report could reflect that defendant said she had not strangled her oldest child, but did not know from what was written if that was actually what she meant to convey. If defendant denied strangling her oldest child, the officer probably would have written that in the report and that may have been what the officer did, but the report was unclear. She suspected that she wanted to convey defendant said she did not strangle her baby, but again she was not sure of her intent when writing the statement. Ultimately, to the officer "the proof [is] in the pudding" and the infant was not taken into protective custody, meaning the officer had no indication the infant was in danger. If she had suspected defendant strangled the infant, she would have taken the infant into protective custody. The officer's typical practice when investigating reports such as these would be to thoroughly investigate whether the infant was in danger. The officer acknowledged her report indicated defendant had no interaction with the infant while the officer was in the home performing an investigation.

When deciding whether to admit evidence defendant strangled her oldest child until he stopped breathing as third-party culpability evidence to show it was defendant

15

who strangled K. and not Montgomery-Gutzman, the trial court said the evidence was admissible as propensity evidence under section 1109 and was not unduly prejudicial. The court found the evidence inadmissible under section 1101, as well as other evidence tending to show defendant was a neglectful parent. Specifically, the trial court believed the evidence directly linked defendant to the commission of the crime charged against Montgomery-Gutzman and was sufficient to raise a reasonable doubt as to his guilt. Further, although no party flagged the issue, the trial court believed this theory of admissibility -- section 1109 -- was available to Montgomery-Gutzman even though the court was unaware of any case law allowing a codefendant to introduce evidence under that section.

The trial court also recognized the child protective services officer's testimony of the event was ambiguous and her recollection nonexistent. The trial court, however, thought the record was sufficient for Montgomery-Gutzman to argue defendant admitted to strangling her oldest child by not denying that she had done so to the officer. Thus, the trial court agreed to instruct the jury on adoptive admissions.

B

*The Propensity Evidence Was Admissible*

Defendant argues the propensity evidence offered by Montgomery-Gutzman was inadmissible as propensity evidence and failed to establish third-party culpability. Generally, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. (*People v. Herrera* (2016) 247 Cal.App.4th 467, 475.) An abuse of discretion occurs when a court makes a decision in an "arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) In other words, the decision " ' "exceed[ed] the bounds of reason, all of the circumstances before it being considered" ' [citation] or its decision [was] 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 708.) When the trial court's decision rests on a

16

question of law, however, we review its decision de novo.  (*People v. Gonzales* (2018) 6 Cal.5th 44, 49.)

1

*Section 1109*

Section 1109 provides in relevant part:  "Except as provided in subdivision (e) or (f) and subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, in a criminal action in which the defendant is accused of an offense involving child abuse, evidence of the defendant's commission of child abuse is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.  Nothing in this paragraph prohibits or limits the admission of evidence pursuant to subdivision (b) of Section 1101.  [¶]  (b) In an action in which evidence is to be offered under this section, the people shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054.7 of the Penal Code.  [¶] . . . [¶]  (e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

Defendant argues the propensity evidence offered by Montgomery-Gutzman was inadmissible under section 1109 for three reasons:  first, Montgomery-Gutzman, as a codefendant, was precluded from introducing evidence under this section; second, the evidence was inadmissible under this section because it occurred over 10 years prior; and third, the evidence was inadmissible because it was more prejudicial than probative.  We reject each of defendant's contentions in turn.

First, we consider whether a codefendant in a criminal action may introduce propensity evidence under section 1109.  The People argue defendant forfeited this claim by not objecting.  We disagree.  While defendant never objected on these grounds, the

17

trial court considered that this theory of admissibility may not be available to a codefendant but found that the theory was available. Given the trial court considered and ruled on the theory now presented on appeal, defendant did not forfeit her claim. (*People v. Abbott* (1956) 47 Cal.2d 362, 372-373.)

Whether a codefendant may introduce propensity evidence tending to show a defendant committed the crime instead of himself or herself is an issue of first impression. Here, the prosecution chose not to introduce the propensity evidence because it undercut its theory that Montgomery-Gutzman was the person to have strangled K. to death. Defendant's assertion boils down to an argument that while the prosecution could have pursued this theory of guilt against her, Montgomery-Gutzman is prohibited from doing so simply because the prosecution deemed it unworthy. We cannot conclude this is the law.

All defendants have the constitutional right to present a defense. (*California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 419].) That right does not encompass the ability to present evidence unfettered by evidentiary rules. (*People v. Brown* (2003) 31 Cal.4th 518, 538.) Indeed, application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense. (*People v. Mincey* (1992) 2 Cal.4th 408, 440.) In the context of this case, however, the application of the ordinary rules of evidence would have allowed for the admission of this propensity evidence. While section 1109 contemplates it is the prosecution that introduces propensity evidence (§ 1109, subd. (b) ["the people shall disclose the evidence to the defendant"]), the availability of a defense cannot be left to the whim of a prosecutor instead of the application of the Evidence Code and constitutional principles of fairness in trial proceedings. Here, the plain language of section 1109 allows for propensity evidence to be admitted against a defendant. It is of no consequence that a codefendant offered the evidence instead of the prosecution; for both are often in adversarial positions

18

to a defendant.  (See *People v. Thompson* (2016) 1 Cal.5th 1043, 1080-1081 [recognizing conflicting and antagonistic defenses between codefendants is common].).)

For these reasons, defendant's reliance on *People v. Rhoades* (2019) 8 Cal.5th 393 is misplaced.  In *Rhoades*, our Supreme Court held that exclusion of a *witness's* prior act of sexual misconduct was inadmissible under section 1108[2] when offered by the defendant to prove third-party culpability.  (*Rhoades*, at pp. 416-417.)  Our Supreme Court reasoned that "[b]y its terms, Evidence Code section 1108 applies only to a criminal defendant's prior sexual offenses.  [Citation.]  As [the witness] was not on trial, his conviction could not be admitted to show a propensity to commit sexual offenses." (*Ibid.*)  This is also true when the propensity evidence is offered by the prosecution.  Our Supreme Court's reasoning in *Rhoades* is not applicable to defendant's case.  Defendant was on trial, thus by the terms of section 1109, her prior act of child abuse was admissible to show a propensity to commit child abuse.  Given this fact and Montgomery-Gutzman's constitutional right to present a defense, we conclude Montgomery-Gutzman was entitled to introduce propensity evidence against defendant under section 1109.

Second, we address defendant's claim the trial court abused its discretion by admitting the propensity evidence.  While evidence of past domestic violence is presumptively admissible under section 1109, subdivision (e) of that section establishes the opposite presumption for evidence of conduct more than 10 years old:  "Evidence of acts occurring more than 10 years before the charged offense is inadmissible, unless the court determines that the admission of this evidence is in the interest of justice."  Here, the trial court made such a finding.  Specifically, the trial court found the prior act of child abuse showed defendant's propensity to commit abuse when under stress.

---

[2]     Section 1108 mirrors section 1109 and provides an identical exception for the admission of evidence of other sexual offenses in a prosecution for a sexual offense.

Defendant argues the trial court's determination was an abuse of discretion because there was no indication she engaged in a pattern of child abuse. She contends this "is the basis for the admissibility of prior acts of child abuse" when the prior abuse is remote in time. Not so. While multiple incidents may create a stronger showing of propensity, nothing in the language of section 1109 or related case law suggests evidence of a defendant's prior act of child abuse is only admissible if there is a pattern of child abuse consisting of multiple incidents. Indeed, appellate courts have affirmed the admission of remote evidence under section 1109, subdivision (e), where the evidence of the prior acts was similar to the charged offenses. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 537-540 [affirming admission of evidence defendant shot two of his prior girlfriends several years prior to the charged offense involving the defendant's shooting of a girlfriend]; *People v. Culbert* (2013) 218 Cal.App.4th 184, 192-193 [affirming admission of evidence defendant threatened his ex-wife 11 years before the charged offense, since "[i]n both incidents, appellant confronted family members in a small room and threatened to kill them"].)

Here, the prior act showed defendant's treatment of a young child in her full-time custody was to strangle him until he stopped breathing. K., a young and medically needy child in defendant's full-time custody, died by strangulation. The fact that defendant did not engage in a pattern of child abuse by strangulation is of no consequence. It is enough that defendant's prior act of child abuse was significantly similar to her current act. However, the evidence tended to show more of a pattern than defendant acknowledges. Defendant's statements indicated K. previously exhibited spots on his face from a lack of oxygen, which she attributed to K. holding his breath until his lips turned blue or crying so hard he could not breathe. While defendant provided an explanation for the presence of the spots, their presence on K.'s face due to a lack of oxygen also suggests defendant caused them herself by strangling him on an ongoing basis until he stopped breathing as a method of managing his care.

Moreover, the evidence showed defendant did not have full-time custody of young children such that the circumstances of her prior offense repeated until she had full-time custody of K. and B. a year and one-half after their birth. Indeed, defendant's mother raised her oldest child after the 2004 strangulation, except for a year when he was five, and raised her second child after that child's birth. Neither of these children lived with defendant as infants on a full-time basis such that she had full-time custody and care of them. Similarly, K. and B. were in the hospital for four months after their birth and then taken out of defendant's custody for six months soon after their release from the hospital. Once returned to defendant's care, she lived with her parents before moving with K. and B. when they were a year and one-half. Altogether, defendant did not have full-time custody and care of her children, such that the circumstances of the 2004 strangulation repeated until she had full-time custody of K. and B. a year and one-half after their birth. When defendant did have full-time custody of a young child, however, the evidence suggested she strangled them as an abusive method of managing their care. Thus, the trial court did not abuse its discretion by determining the admission of remote propensity evidence was in the interest of justice.

Third, we address defendant's contention the propensity evidence should have been excluded because the prejudice of its admission outweighed the probative value and thus also violated her right to due process. Section 352, which section 1109 "expressly incorporates" (*People v. Kerley* (2018) 23 Cal.App.5th 513, 532), gives the trial court discretion to exclude or admit evidence of past domestic violence after the court weighs the probative value of the evidence against "the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (§ 352). The law requires " 'the probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in

21

introducing and refuting the evidence of uncharged offenses.' " (*People v. Culbert*, *supra*, 218 Cal.App.4th at p. 192.) " 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.)

Defendant argues the propensity evidence should have been excluded under section 352 because the prior act was remote, may not have occurred, and defendant was never convicted of child abuse. As described *ante*, the similarity between defendant's prior act and the charged offense against K. is great. Further, the prior act, while remote, occurred at a time when defendant was in similar circumstances as she was at the time of K.'s death. True, it is unclear whether defendant actually strangled her oldest child in 2004; however, the child protective services officer testified as to its uncertainty, thus reducing the potential prejudice.

Further, admission of the evidence did not unduly consume time. This was a long trial and only two of the many witnesses were devoted to defendant's prior bad act. Finally, it is not likely the jury would have punished defendant for her past conduct by finding her guilty in this trial. (*People v. Scott* (2011) 52 Cal.4th 452, 490-491 [" ' "evidence [is] unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction" ' "].) Defendant was a young and new parent at the time of the 2004 incident, her oldest child was not permanently injured and did not suffer any lasting effects. On balance, the trial court did not abuse its discretion when admitting the propensity evidence. For the same reasons, defendant's due process right was not violated.

## 2

### *Third-Party Culpability*

Our inquiry into whether the propensity evidence was admissible when offered by Montgomery-Gutzman does not end simply because the evidence qualified as propensity evidence -- the evidence still must be relevant.  (*People v. Lewis* (2001) 26 Cal.4th 334, 372.)  Montgomery-Gutzman alleged the evidence was relevant because it tended to show third-party culpability -- that is, defendant and not Montgomery-Gutzman strangled K.  Defendant argues the trial court abused its discretion by agreeing with Montgomery-Gutzman that the propensity evidence was relevant to show third-party culpability.  We disagree.

In a criminal case, a defendant is entitled to present evidence of third-party culpability for the charged offense, provided such evidence is sufficient to raise a reasonable doubt as to his or her guilt.  (*People v. Lewis*, *supra*, 26 Cal.4th at p. 372.)  However, evidence that a third party merely had a motive or an opportunity to commit the charged offense, without more, does not raise a reasonable doubt about a defendant's guilt; rather, a defendant must present direct or circumstantial evidence linking the third person to the actual perpetration of the crime.  (*Ibid*., citing *People v. Hall* (1986) 41 Cal.3d 826, 833.)

Defendant argues this standard was not met here because defendant's 2004 strangulation of her oldest child until he stopped breathing did nothing to link her to the strangulation death of K. in 2016, especially since the evidence did not establish she engaged in a pattern of child abuse.  We have already rejected defendant's argument that relevance only lies if the remote propensity evidence established a pattern of child abuse.  The propensity evidence was relevant to show how defendant treated and abused young children in her full-time custody and care.  The evidence showed defendant did not have full-time custody of her infant or toddler children after her oldest child went to live with her parents until a year and one-half after K. and B. were born.  Thus, the relevance of the

2004 incident is not in establishing the abuse was ongoing, but that defendant acted similarly when presented with similar circumstances.

Further, defendant's 2004 strangulation did more than " 'merely . . . show that the third party was the more likely perpetrator,' " contrary to defendant's argument. (Citing *People v. McWhorter* (2009) 47 Cal.4th 318, 373.) Montgomery-Gutzman's defense was that defendant strangled K., but not to death, before she left to get heroin. He argued the injury caused to K. by defendant's act of strangulation did not materialize until Montgomery-Gutzman was alone with the children and it caused K.'s death. While this theory was undercut by the pathologist who performed K.'s autopsy, the theory was supported by evidence demonstrating defendant had a propensity to strangle young children in her full-time custody until they stopped breathing and before death as a method of handling their care. This theory was also supported by the spots defendant said K. often exhibited due to a lack of oxygen intake. Not only did defendant have the opportunity and motive to murder K. under this theory, but it showed she had the propensity to do so because of her prior act. If believed, this theory had the potential to raise a reasonable doubt as to Montgomery-Gutzman's guilt. Thus, it was not an abuse of discretion for the trial court to admit the 2004 propensity evidence as third-party culpability evidence.

C

*There Was No Instructional Error Related To The Propensity Evidence*

Defendant raises two instructional error arguments related to the propensity evidence. First, she argues the trial court's modified version of CALCRIM No. 852 related to propensity evidence was confusing. Second, she argues the trial court erred by instructing the jury it could find she made an adoptive admission to the child protective services officer in 2004 that she strangled her oldest child. We disagree on both accounts.

24

1

*CALCRIM No. 852*

The court instructed the jury as to propensity evidence with a modified version of CALCRIM No. 852 as follows: "Evidence was presented that the defendant . . . committed domestic violence that was not charged in this case; specifically, that she allegedly strangled her older child in 2004. [¶] Domestic violence means abuse committed against a child of the defendant. [¶] Abuse means . . . intentionally or recklessly causing, or attempting to cause, bodily injury, or placing another person in reasonable fear of imminent serious injury to himself or someone else. [¶] You may use this evidence in two ways: [¶] One, to raise a reasonable doubt as to Taylor Montgomery-Gutzman's guilt. [¶] And, two, to prove defendant['s] . . . guilt.

"You may consider this evidence against [defendant] only if a preponderance of the evidence proves that she, in fact, committed the uncharged domestic violence. [¶] Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. [¶] A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the evidence has not met this burden of proof, you must disregard this evidence entirely as to [defendant]. [¶] If you decide that the defendant . . . committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that she was disposed or inclined to commit domestic violence, and, based on that decision, also conclude that she was likely to commit and did commit the murder of [K.], as charged in Count 1; assault upon [K.] causing death, as charged in Count 2; and child abuse of [B.], as charged in Count 3. [¶] If you conclude that [defendant] committed the uncharged domestic violence, that conclusion is only one factor to be considered along with all the [other] evidence. It is not sufficient by itself to prove that she is guilty of the crimes charged. The People must still prove each charge and allegation beyond a reasonable doubt.

25

"As to Taylor Montgomery-Gutzman, this evidence need not be proven by a preponderance of the evidence. The evidence need only raise a reasonable doubt that he committed the crimes charged."

Defendant acknowledges her trial counsel did not object to the giving of this instruction on the grounds asserted on appeal, but argues we must review the instruction in any event because it is intertwined with her counsel's objection to the admission of the propensity evidence and the instruction affected her substantial rights. Because defendant argues the instruction affected her substantial rights, we will address her argument. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579-580.)

Citing *People v. Cruz* (2016) 2 Cal.App.5th 1178, defendant argues that the instruction was confusing because it "required the jury to utilize two different standards of proof to determine whether the 2004 incident was relevant to its determination of guilt. [Defendant] believes this was error as there is no realistic way to expect jurors to be able to make such an impracticable and illusory distinction. A fact is either true or it is not. [Defendant] either committed domestic abuse in 2004 or she did not. The notion that the 2004 incident was true in connection to Montgomery-Gutzman (because it required a higher standard of proof) is a fiction that could not reasonably be expected to be sorted out by jurors." Defendant does not argue the instruction was legally incorrect, nor do we address that question. Instead, she merely argues the instruction was confusing for the reasons articulated in *Cruz*.

In *Cruz*, instead of properly informing the jury that it could use other charged offenses as propensity evidence only if those charged offenses were proven beyond a reasonable doubt, the jury was told that it could apply a preponderance-of-the-evidence standard when those charged offenses were being used as propensity evidence, but was then required to use a beyond-a-reasonable-doubt standard to determine whether the defendant was guilty of the same charged offense. (*People v. Cruz*, *supra*, 2 Cal.App.5th at pp. 1185-1186.) The court in *Cruz* reasoned, "It would be an exaggeration to say the

26

task required of the jury by the instruction given in this case . . . was logically impossible. A robot or a computer program could be imagined capable of finding charged offenses true by a preponderance of the evidence, and then finding that this meant the defendant had a propensity to commit such offenses, while still saving for later a decision about whether, in light of all the evidence, the same offenses have been proven beyond a reasonable doubt. A very fastidious lawyer or judge might even be able to do it. But it is not reasonable to expect it of lay jurors. We believe that, for practical purposes, the instruction lowered the standard of proof for the determination of guilt." (*Id*. at p. 1186.) The instruction in *Cruz* "presented the jury with a nearly impossible task of juggling competing standards of proof during different phases of its consideration of the same evidence." (*Id*. at p. 1187.)

Defendant's reliance on *Cruz* is misplaced. *Cruz* involved the jury utilizing competing standards regarding the same evidence as to a single defendant. (*People v. Cruz*, *supra¸* 2 Cal.App.5th at pp. 1180, 1187.) In contrast, the jury here was instructed of its duty as it related to each defendant. While the standards were different, the jury was clearly told the standard it must employ depended on the defendant for which it was determining guilt. Defendant does not argue the legal principles articulated were erroneous, only that it was impossible for the jury to keep the principles distinct from one another. We disagree. The trial court clearly articulated the jury could use the evidence in two distinct ways -- one as to defendant's guilt and the other as to Montgomery-Gutzman's guilt. It then defined the process the jury was to engage in when analyzing the evidence based on the defendant it was assessing. In codefendant cases, the jury is often told it must consider evidence in one way for one defendant and another way for the other defendant. (See, e.g., *People v. Winbush* (2017) 2 Cal.5th 402, 457; *People v. Letner & Tobin* (2010) 50 Cal.4th 99, 152.) We believe it reasonable for a jury to follow these instructions and apply the proper burden of proof when assessing defendant's guilt. Thus, defendant's claim has no merit.

27

## 2

### *Adoptive Admission*

The trial court instructed the jury as to adoptive admission as follows: "If you conclude that someone made a statement outside of court that accused [defendant] of strangling her child in 2004, and the defendant did not deny it, you must decide whether each of the following is true: [¶] One, the statement was made to the defendant or in her presence. [¶] Two, the defendant heard and understood the statement. [¶] Three, the [d]efendant would, under all the circumstances, naturally have denied the statement if she thought it was not true. [¶] And, four, the [d]efendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider that statement or the defendant's response for any purpose. You must not consider this evidence in determining the guilt of defendant Taylor Montgomery-Gutzman."

Defendant argues this instruction was erroneous because the evidence "was insufficient to support the inference [she] made an implied admission to strangling her [oldest] son by failing to deny it" to the child protective services officer. This was so, defendant argues, because the child protective services officer "was not able to recall what [defendant] said or did not say when she came out to visit back in 2004."

It is error to give an instruction that is correct, but irrelevant or inapplicable, i.e., not supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 40 [" 'unsupported theories should not be presented to the jury' "].) "Substantial evidence is evidence that would allow a reasonable jury to find the existence of facts underlying the instruction . . . ." (*People v. Jantz* (2006) 137 Cal.App.4th 1283, 1290.) An appellate court reviews the trial court's decision to give a particular instruction de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

Here, the child protective services officer admitted her report was ambiguous and could mean defendant denied strangling her baby or did not deny strangling her baby. While she believed she meant to convey that defendant denied strangling her baby considering she did not take the infant into protective custody, she could not definitively say so because the officer had no recollection of the interaction with defendant. While this evidence is susceptible to multiple interpretations, one of those interpretations is that defendant did not deny strangling her baby when a child protective services officer investigated a report that defendant claimed to have strangled her baby.

Defendant disagrees that the evidence was sufficient citing *People v. Chism* (2014) 58 Cal.4th 1266. There, our Supreme Court found the adoptive admission instruction not supported by sufficient evidence because the defendant's mere possession of an accusatory letter was insufficient to support a finding the defendant manifested a belief in the accusations contained in the letter. (*Id.* at p. 1297.) In contrast here, there was evidence of defendant's reaction to the accusation she strangled her oldest child, the evidence was just ambiguous. Thus, sufficient evidence supported the giving of the adoptive admission instruction.

## II

*The Charge Of Failure To Act As Contained In The Aiding*

*And Abetting Instruction Was Not Confusing*

The jury was instructed that to find defendant guilty of murder it must find "one, the defendant had a legal duty to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child; and, two, when the defendant acted, or failed to act, he or she had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought: Express malice, and implied malice. [¶] . . . [¶] The defendant had implied malice if, one, he or she intentionally committed the act, or intentionally failed to act, when he or she was under a legal duty to act. [¶] Two, the natural and probable consequences of the act, or failure to

29

act, were dangerous to human life.  [¶]  Three, at the time he or she acted, or deliberately failed to act, he or she knew his or her act or failure to act was dangerous to human life.  [¶]  And four, he or she deliberately acted, or deliberately failed to act, with conscious disregard for human life."

As part of the instructions on aiding and abetting, the court charged the jury that the "word act, as used in these instructions, includes an omission or failure to act in those situations where a person is under a legal duty to act.  [¶]  A parent has a legal duty to her minor child to exercise reasonable care.  [¶]  If you conclude that the defendant . . . owed a legal duty to [K.], and she intentionally failed to perform that duty, her failure to act is the same as doing a negligent or injurious act."

Defendant contends the trial court erred by instructing the jury that her failure to act was the same as performing a negligent or injurious act.  Citing *Johnson*, defendant argues that including language that her failure to act equated to negligence was confusing "because it had the tendency to conflate criminal negligence with implied malice." (*People v. Johnson* (2016) 6 Cal.App.5th 505, disapproved on other grounds in *People v. Hicks* (2017) 4 Cal.5th 203, 214.)   Defendant recognizes her counsel did not object to this instruction but argues the court's error affected her substantial rights and lowered the burden of proof.  Thus, we will address defendant's claim.  (*People v. Mitchell*, *supra*, 7 Cal.5th at pp. 579-580.)

In *Johnson*, the prosecution sought to premise liability on a failure to exercise the general duty of care by driving while drunk.  The jury was instructed as part of the second degree murder instruction that " '[a] driver has a legal duty to operate a motor vehicle with care and caution to others at all times.  [¶]  If you conclude that the defendant owed a duty to [the victim], and the defendant failed to perform that duty, his failure to act is the same as doing a negligent or injurious act.  [¶]  If you find the defendant guilty of murder, it is murder of the second-degree.' " (*People v. Johnson*, *supra*, 6 Cal.App.5th at p. 515.)  The court reasoned the reference to a negligent act was

30

"confusing, to say the least" because a general duty of care is not akin to the special duty to act and there was an "absence of any other discussion of negligence in the jury's instructions." (*Id*. at p. 515 & fn. 6.) While it was possible that the jury might have recognized the reference to negligence was irrelevant, "the language suggests a finding that [the] defendant failed to drive with adequate care . . . equates to culpability for second degree murder." (*Id*. at p. 516.)

In contrast here, the jury was not instructed on the concept of negligence as part of the second degree murder instruction. Indeed, the jury was properly instructed on the elements of second degree murder, which included the concepts of both an affirmative act and the failure to act. It was then instructed with the additional elements that the failure to act must have been deliberate and done with conscious disregard for human life. Further, the jury was instructed on criminal negligence as a legal theory pertaining to involuntary manslaughter and child abuse. Thus, the provision equating a failure to act with a negligent act was relevant to defendant's case unlike the case in *Johnson*, where the single theory of culpability was second degree murder. (*People v. Johnson*, *supra*, 6 Cal.App.5th at pp. 515-516.) This jury was given a clear and complete view of the legal theories applicable to defendant's case, which included both implied malice and criminal negligence, and it could accurately determine where the instruction on failure to act fit into the whole of the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["jurors are presumed able to understand and correlate instructions"]; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1182 [the instructions are to be considered as a whole and not in isolation].) Accordingly, we do not agree with defendant's contention the instruction conflated criminal negligence with implied malice.

31

## III

### *The Court's Instruction Classifying Child Abuse*
### *As A General Intent Crime Was Harmless*

The jury was instructed regarding the union of act and intent as follows: "The crimes and other allegations charged require proof of the union or joint operation of act and wrongful intent. [¶] The following crimes and allegations require general intent: Assault on a child under age eight resulting in death, as charged in Count 2; child abuse, as charged in Counts 3 and 4; the allegation in Count 4 [defendant] permitted [K.] to suffer pain or injury resulting in death in violation of Penal Code Section 12022.95; and the lesser offenses of assault likely to produce great bodily injury, simple assault, and simple child abuse. [¶] For you to find a person guilty of these crimes or to find the allegation true, that person must not only commit the prohibited act, or fail to do the required act, but must do so with wrongful intent. [¶] A person acts with wrongful intent when he or she intentionally does a prohibited act on purpose or fails to do a required act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation."

Defendant argues this instruction misstates the law because the child abuse charged in counts 3 and 4 is not a general intent crime when the theory of guilt is based on indirect child abuse, which was one of the prosecution's theories as it related to her. The People concede that, when based on an indirect theory of abuse, child abuse as charged in counts 3 and 4 is not a general intent crime. The People, however, argue the error was harmless because the instruction on child abuse identified the correct mental state. We agree with the People.

Whether the *Watson* harmless error standard or the more stringent *Chapman* standard is applicable to the incorrect identification of an offense as a general intent crime is not settled. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 162 [noting the unsettled nature of the issue but deciding the error was harmless "[e]ven under" the more

stringent *Chapman* standard]; *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1168 [applying *Chapman* standard without discussion].)  We need not decide which standard applies because we find the error harmless even under the more stringent *Chapman* standard.

Our Supreme Court has observed that classifying an offense as a general intent or specific intent crime is not always meaningful because " ' "[t]he critical issue is the accurate description of the state of mind required for the particular crime . . . ." ' " (*People v. Rathert* (2000) 24 Cal.4th 200, 205.)  Classification is necessary " 'when the court must determine whether a defense of voluntary intoxication or mental disease, defect, or disorder is available; whether evidence thereon is admissible; or whether appropriate jury instructions are thereby required.' " (*Ibid.*)

Here, the instructions on child abuse accurately reflected that to convict defendant of indirect child abuse the jury must find "defendant was criminally negligent when he or she caused or permitted the child to be endangered."  The instruction defined criminal negligence as "involv[ing] more than ordinary carelessness, inattention, or mistaken judgment.  [¶]  A person acts with criminal negligence when:  [¶]  One, he or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation.  [¶]  Two, the person's acts amount to disregard for human life or indifference to the consequences of his or her act.  [¶]  And three, a reasonable person would have known that acting in that way would naturally and probably result in harm to others."

Even though a preliminary instruction informed the jury child abuse was a general intent crime and all that was required was for defendant to hold a wrongful intent, the specific instructions defining the elements required to find her guilty of indirect child abuse specified more was required.  Specifically, the jury must also find defendant was criminally negligence.  Further, nothing the prosecutor said during closing arguments suggested to the jury that it should disregard the explicit direction of the specific

33

instructions and there is no reason to believe the jury did so. (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 852 [jurors are presumed to have followed the court's instructions].) Thus, there is "simply no reason to believe that the jury would have disregarded the explicit direction of the later instructions because of, at best, a mere implication arising from the earlier instructions." (*People v. ZarateCastillo*, *supra*, 244 Cal.App.4th at p. 1169.) Accordingly, the error was harmless beyond a reasonable doubt.

## IV

### *There Was No Cumulative Error*

Defendant contends there was cumulative error. Because there was only one error, there is no error to cumulate. (*People v. Sandoval* (1992) 4 Cal.4th 155, 198.)

## V

### *Counsel Was Not Ineffective At Sentencing*

Defendant argues her counsel was ineffective for failing to object at sentencing to the trial court's imposition of the upper term of six years for the abuse of B. because the court improperly relied "on the single fact that [defendant] engaged in violent conduct which indicates a serious danger to society" as reflected in the probation report. (Capitalization omitted.) Defendant argues it was unclear whether the jury found her guilty of the abuse of B. on a direct or indirect theory, thus it was error to base a sentencing decision on a fact not found by the jury.

To establish ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688-688 [80 L.Ed.2d 674, 693]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability

34

is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

The problem with defendant's argument is that, even if counsel had objected to the reason stated in the probation report, she was not prejudiced because the court stated during the oral imposition of sentence that it relied on two different factors to impose the upper term -- defendant held a position of trust and she allowed B. to suffer extensive and prolonged injuries over time. (*People v. Osband* (1996) 13 Cal.4th 622, 728 [a single aggravating circumstance is sufficient to support an upper term sentence].) Defendant argues her case still must be remanded because "the court's improper consideration of a sentencing factor does not turn on the existence of other legitimate factors upon which the trial court theoretically could have relied." But the trial court did not theoretically rely on these other factors, it actually relied on them. While it also stated it reviewed the circumstances in aggravation contained in the probation report and intended to follow the probation department's recommendation regarding sentencing, the trial court did not adopt the circumstance in aggravation as its own or regurgitate the complained-of aggravating factor when orally justifying its imposition of the upper term for the abuse of B. Thus it is not reasonably likely the trial court would have changed its sentencing decision if counsel had objected to the aggravating factor provided in the probation report.

VI

*Defendant's Abstract Of Judgment Must Be Corrected*

Defendant contends her abstract of judgment must be corrected to reflect the trial court waived the court security fee and criminal conviction assessment. The People agree, as do we.

At sentencing, the trial court waived all fines and fees, except for the restitution fine. Thus, defendant's abstract of judgment erroneously reflects the court security fee and criminal conviction assessment were imposed. (*People v. Mitchell* (2001) 26 Cal.4th

181, 185 ["[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize"].)  Accordingly, the abstract of judgment must be corrected.  (*Ibid.* ["a court has the inherent power to correct clerical errors"].)

## DISPOSITION

The trial court shall correct defendant's abstract of judgment to reflect the court security fee and criminal conviction assessment were not imposed.  The court shall forward a certified copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


<u> /s/ </u>
Robie, J.


We concur:


<u> /s/ </u>
Blease, Acting P. J.


<u> /s/ </u>
Krause, J.